minutes. The red light comes on. Cut it short. Obviously, we can keep you up here longer, but you can't keep you up here longer. Please remember that rebuttal is for rebuttal only. As well, we always value record sites. So if you're focused on something in the record, if you can give us a record site, we would very much appreciate that. And fair warning, I have my iPad up here where I can look up the record site. So it's helpful if it's accurate. So with that, we will start the day with the United States of America v. Darwish, case number 17-60228. And we'll ask Mr. Sy to speak first. Thank you, Your Honor. Good morning. May it please the Court. Opposing counsel. My name is Kiger Sy, and I'm an attorney with the Federal Public Defender's Office in Oxford, Mississippi. I represent the appellant in this case, Mr. Thomas Muhammad Darwish. When federal sex crimes are brought, typically the victims want nothing to do with the defendant. However, this is a unique case. It involves a relationship between a defendant and a minor victim whose family believes the relationship is both beneficial and should continue. The issues before this Court revolve around this relationship, the plea agreement entered, and ultimately the parameters of a district court's authority to prohibit conduct between the minor victim and the defendant during his 10-year period of incarceration. We submit that the district court exceeded its authority where Congress gave it none because the Bureau of Prisons controls, excuse me, because the Attorney General controls all aspects of the Bureau of Prisons, and this is not an extraordinarily rare or compelling case which would allow invocation of inherent authority. Mr. Sy, good morning. Didn't your client agree to this condition of his sentence? Your Honor, we would submit that the plea agreement that was entered at the time of the change of plea, during the change of plea hearing, the prosecutor at the change of plea hearing made remarks about that special condition. Well, I know. I've read that. I'm referring to the plea agreement at page 152 of the record that says the defendant agrees that the court should order as part of the judgment and conditions of supervised release that he shall have no contact with and not attempt to contact the victim or the victim's family during his incarceration or the subsequent term of supervised release. I do understand that the court cut him a break on the supervised release, but my question is didn't he agree to this? Yes, Your Honor, he did. And what did he get in exchange for it? Well, it was an 11c1c agreement, and so his sentencing guideline range was significantly higher than what it would have been had he not entered into this plea agreement. But we would submit that the plea agreement It was higher? The sentencing guideline range? Yes, Your Honor. So he agreed to a higher guideline range in exchange for my apologies if I misspoke there. His sentencing guideline range was higher based on the sentencing guidelines. However, his 11c1c agreement His plea was lower than the sentencing guideline. Okay. I've got 120 months. That's correct. He got the minimum. Okay. He could have got less. I didn't understand. I thought you were saying he agreed to a higher guideline. You're saying because the guidelines were higher, he agreed to a lower? That's correct, yes, Your Honor. Okay, gotcha. And what could he have gotten had he not? The sentencing guideline range was a criminal history category one. He could have been looking at 168 to 210 months in prison. He got 120? That's correct. I read during the sentencing hearing that he expressed some pretty intense gratitude for the plea agreement. Didn't he say he was considering harming himself? He did. He has always been a reclusive, introverted person. He described himself with feminine qualities and someone that wasn't outside of, he wasn't a person that would go out and socialize. He was always kept to himself, very reclusive. Not reclusive enough, apparently. Yes, Your Honor. He did use the internet as a means of escape. He used that and that's how Yes, but he didn't simply do stuff over the internet. He also had contact with this minor. Correct. The relationship started off on the internet and he was in a chat room. The victim, in this case, entered that chat room. They did strike up a friendship online only. After a few months of contacting each other back and forth through the internet and playing games with one another, they did move that relationship into either text messaging, which eventually wound up being in person. Photos were exchanged, right? Yes, Your Honor, they were. I've read the PSRI. I don't want to get into it in open court, but photos, pretty explicit photos were exchanged at the behest of your client. Absolutely. Yes, Your Honor. There's no question that those pictures were exchanged and that the content of those messages was not something that people would find social. Given that he agreed, it would be difficult under an abusive discretion standard to say the district court abused his discretion, but the issue that you began with is one that I want to explore a little deeper, which is the succeeding authority. For example, you can't agree to subject jurisdiction in federal court if it's not there, that kind of thing, or any court, really. So is it that kind of exceeding authority? In other words, that even if he waived it, even if he agreed to it, even all of those things that would normally end the appellate issue, is it just something he can't agree to because the judge simply lacks the power to do that? Your Honor, I think it's kind of a complicated issue. However, if I may try to explain my At the time of the change of plea, plea agreements are contractual in nature. And at the time of the change of plea, based on the prosecution's remarks that it was an option for the victim to initiate contact rather than the defendant to initiate the contact, that's what Mr. Darwish had believed. Now, at the sentencing, the issue kind of unfolded a little bit. All right. I want to clarify. Please. Your client believed that it was only a one-way provision. That's correct. Doesn't the text pretty clearly state that it's a bar on both parties? In the special condition itself, in the plea agreement, yes, Your Honor, it does. Again, based on the prosecutor's remarks, he attempted to accommodate the victim's family's wishes to initiate contact on a one-way street. It was never intended to be a two-way street where contact You're not seeking to invalidate the plea agreement, which would be where you get into what a reasonable defendant would perceive and all this kind of stuff, right? Did not brief that. You've admitted that in the exchange with Judge Duncan that you got a benefit out of it. That issue, I mean, his understanding to me is, it still doesn't answer my question, which is regardless of what he agreed to, you can't agree to something that a judge lacks authority to do. That's correct. And therefore, does the judge lack the authority to impose this condition in this case? We believe that the district court lacks authority to, excuse me, to invoke its inherent authority for this no-contact special condition. We believe that there are two reasons that would support Mr. Darwish's position, the first being that there's no Federal statute out there that would grant the district court power to prohibit contact in this instance. Now, in Mistrada, it states that only Congress has the judicial power to limit or expand the scope of judicial discretion in sentencing by enacting statutes. With these sentencing powers, Congress did exactly that, and they enacted 18 U.S.C. 3582D, which is a communication restriction in only two very specific types of cases, those being RICO cases. It seems like the parties agree this is not a statutory case. Do you acknowledge that if we were in the Ninth Circuit, this type of order would be allowed? Your Honor, based on? Based on Wheeler? On Wheeler? There are a couple other cases as well in the Seventh and Ninth. Of course. So we would still disagree with that proposition, because in the Seventh Circuit case, which was Morris, and I believe that's the case that more thoroughly developed this question, the analysis there by that court was that the special condition in a communication restriction case held that the court's inherent authority to protect the administration of justice from abuses, oppression, and injustice, but they reined that power in. They said that it can only be exercised with circumspection. Well, wasn't it to protect a witness? That's correct, yes, Your Honor. Slightly different facts. Okay. Well, what if the facts were that the order needed to be in place to protect the victim? Not just the witness, but the victim. And those are — victim and witness can be almost interchangeable. Okay. So you would agree with that? That court has inherent authority to issue an order to protect the victim from the defendant? In certain circumstances. Only when the case is rare and compelling. Well, how about — so how about where the defendant — there's evidence the defendant intends to continue the very same conduct with respect to the victim that led to his conviction in the first place? We believe the district court would have to use the two-prong test that was set forth in — Judge Ho, I believe you just referenced this case, the Wheeler case. There they took a Supreme Court case and they used the two-prong test which stated that in order to sustain this no-contact special condition, that the court must find that there's a clear and present danger to the victim and that it must be narrowly drawn and reasonable alternatives for that no-contact to stand. We do not believe that that first prong can be met. Here, the sentencing letters in this case corroborate the position of Mr. Darwish that the family and the victim both want to continue this relationship. With all due respect to the family — well, I guess two-part question. Has the family read the PSR? Yes, Your Honor. In the PSR, there is a victim impact statement there that suggests that they did not even want Mr. Darwish to have a sentence of imprisonment. Mr. Darwish — Can the court — with all due respect to the family, can the court reach a conclusion based on the evidence that the family is deeply misguided? Yes, Your Honor. The district court does have that authority to do that. We would still submit that based on the facts, the unique situation that we have here, in a rare and compelling case based on the Wheeler, we would represent that this case is rare and compelling for a completely different reason. Those rare and compelling cases — I'm just wondering if the court even knew that this was the analysis that was supposed to be being made, because this argument, this spin on the argument, only came out because we, the Fifth Circuit, asked y'all to file a supplemental briefing on it. I mean, y'all were not even making the appropriate arguments. So I'm wondering, if you weren't making them to us, whether there's any reason why the district court would have even known what the path was that needed to be followed. And so does it make sense to vacate it and have the court — if we're going to have a two-part test or whatever that we're going to adopt, and say there may be that rare and compelling case where you do have that inherent authority by its nature, in my opinion, should be very limited in a federal court. But if we say there's that little sliver, and we just have to know, does this fit in that sliver, shouldn't the district court at least have the opportunity to address that in the first instance? Well, we would request that the court remain the case so that the district court could reanalyze this case under this two-prong test and determine whether or not it is rare and compelling for those very reasons. What do you make of the Chambers case? We believe that Chambers and Ex parte — none of the cases the Court asked us to review, we do not believe any of them harm Mr. Darwish's position. We believe that in Ex parte and Chambers, they both state that the Constitution grants these — excuse me, the Constitution does not define what judicial power is, which is a power that is vested in both the Supreme Court and all of these lower courts created by Congress. But the inherent powers, we see them all the time. Courts do use inherent powers to manage their caseloads and sanction attorneys, as we saw in Chambers, even though there are statutes and rules that are out there. I guess what I'm trying to suggest, it seems to me that Wheeler and some of these other circuits are hard to reconcile with Chambers. We — well, Your Honor, we would believe that they kind of coincide with each other in the sense that in Chambers, one of the lines that you all had requested us — page sites that we had reviewed stated that because of the very potency, these inherent powers must be exercised with restraint and caution. And we believe that's how a lot of these cases that the prosecution had cited in its brief kind of also review these cases. I don't know. Wheeler seems pretty broad. It says that you can protect a witness after the trial in order to encourage that witness and other potential witnesses to come forward. It would seem to me that that would apply in theoretically every criminal case. Well, yes, Your Honor, theoretically every single case that — Why not just ask us to disagree with Wheeler? I'm — excuse me. Why not just ask us to disagree with Wheeler? We're not bound by Wheeler. Well, that would be an option for this Court. However, we — you know, we still believe that the facts of this case are slightly different from the other cases that are provided. Mr. Tsai, you had started to say there were two reasons that there was no authority. One was the lack of a Federal statute, and, in fact, there is a Federal statute, but it's limited to two things that don't fit here. What was the other? The lack — the district court exceeded its inherent authority. While we believe that there is inherent authority that district courts possess, we do not believe that in this specific case, based on these different standards for the rare and compelling, the significant administration of justice that was, I believe, stated by Morris, that none of these cases would provide the district court in Mr. Darwish's case an opportunity to — What's the limiting principle, then? You just conceded that there was inherent authority, but you say that this case doesn't fall within it. What's the limiting principle? The limiting principle? Is it the stage of the proceedings? Is it that the proceedings before the district court are now over, and now it's over to the Bureau of Prisons, or is it the nature of the — of the order that's given? Well, first, if I may respond to the Federal statutory, we would believe that there are only two instances where that communication restriction could be imposed, at sentencing by the district court or post-sentencing, upon motion by the director of the Bureau of Prisons or by the AUSA. As for the inherent authority argument, we still believe that because of the facts in this case, it is not a rare and compelling case that would warrant this invocation of inherent authority. So very quickly, you said that we should reject Wheeler. What is your two-step process, or what is your test? If you were writing this opinion, what's the test you would write? I guess if I bespoke, then I bespoke. But for Wheeler, we're not necessarily outright saying that it should be not followed by the Fifth Circuit. We do think that if this Court were to incorporate this two-part test that was already established, applying the facts to it, we do not believe that the facts of Mr. Marwish's case are the same as Morris, Wheeler, Capozzi, or any of the other cases that were cited in the prosecution's brief, based on the nature of the relationship, the request by the family, and the lack of criminal history other than the instant offense. Didn't he have a prior offense where he was trying to initiate a sexual relationship with a 13-year-old when he was 18? Yes, Your Honor, he did. My time is up. Okay. You've saved time for rebuttal. Thank you. Thank you, Your Honor. If you may please the Court. My name is Paul Roberts. This is, I wrote the plea agreement. I think that probably the wrench that's thrown into it is the family of the victim, their desires. I, at the change of plea, explained to the Court that I was trying to do something to help the minor and her family. If they had followed the course that I think would have been appropriate, we wouldn't be here. I don't think there would have been any contest, because he did agree to it in the plea agreement. The plea agreement probably is not something that we're going to be able to rely on because of my language of the change of plea, to be honest. But don't they have to seek to set aside the plea in order to construe the plea differently than it's actually written? Not if we don't enforce it. And I don't think we're enforcing it to the extent that we're making it mandatory for the Court. We gave the Court, I think, an option. It's an 11C1C. It is 11C1C. We're not— It's written as it's written. In the absence of the defendant saying, look, I understood something different and here's why, the evidence from the change of plea or whatnot, I think you'd go with the plea, right? I mean, the deal's a deal. If you're going to undo the deal, then— Well, I want to be frank with the Court. I think that I have probably undercut that position because of the victim's family and what they stated to defense counsel prior to the change of plea. So I don't think we can just rely on the plea agreement and say they agreed to this, game over. Well, and it doesn't answer my question, which is in regards to the plea agreement can't give the Court authority or jurisdiction it doesn't have. And let me address that. I think that— Why don't you talk to that? There's no question Courts have inherent authority to protect their jurisdiction and to accomplish what they need to accomplish. And I don't think there's any—and I think even in the dissents in Chambers or NASCO, whatever you want to call it, I've been calling it NASCO, even Justice Kennedy and Justice Scalia in their dissents say there's inherent authority. It just has to be exercised in a way that ensures due process, ensures that it's happening in a way that protects everyone involved. Well, I think it's said more than that. I'm just looking at the majority opinion in Chambers, which obviously took a broader view. The Court said that the inherent power is what is necessarily vested in Courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. Here, you're not talking about the Court managing its own affairs, but the affairs of a prison. Well, I don't know that we're—and maybe that's an area that we've all fallen into, especially from us not thinking about these issues in terms of authority, but in terms of I don't think it ever occurred to us that the Court didn't have power to do this. It never occurred to me. It didn't occur to you? No. I mean, the Bureau of Prisons is very protective of its power over the prisons to the point that as a sentencing judge, you have to say, I recommend drug treatment. I recommend, you know, Segalville versus this other city. I recommend all this stuff because if you dare to say do it, oh my gosh, you're just And that is executive versus judicial. So I mean— And I think also the problem that happens here is that the most logical place for this to happen is at sentencing. But it's—and in the judgment itself, it's entered as part of the sentence. But this is a no-contact order. More—it's not—it's—we've construed it as a punishment, but it's a protective order. It's separate and arguably should have been entered as a separate argument had we anticipated these issues. Argument it's not part of the sentence? Again, it's the most logical proceeding for this no-contact order to take place is the sentencing. But given these concerns, probably it should have been entered as a separate order apart from sentencing and then would have been enforced by contempt powers. There's a case that will be argued in the Ninth Circuit, U.S. versus Peyton Adams, I believe is the name. It's—I can get the docket number for you. We argued in November in Pasadena in the Ninth Circuit, and there was a no-contact order. It may have been waived by the defendant in the method of appeal, the appellant, but it was enforced by a contempt prosecution. And so that may be—and then that's maybe the inherent problem. The— The protective orders usually are requested by the victims and so forth. That isn't the procedural posture in which this comes to us. That's right. It almost seems like you're arguing for the point that I made earlier with counsel opposite, which is that perhaps this should go back to the district court to consider this in light of the correct posture, which is if the court is exercising—and I think we can all agree inherent authority has to be constrained in some way. If we're talking about a Federal court of limited jurisdiction, it can't just have So whatever those limits are, don't—shouldn't the district court have the opportunity in the first instance to consider those limits and determine whether this falls within those, even assuming there is such authority here? I think if you look at the cases, the Seventh Circuit and Ninth Circuit cases, Wheeler and Morris and Sotelo as well. Sotelo actually is interesting because in Sotelo, the order was very broad, but the actual victim, that's in a footnote in Sotelo. So the court dismisses the protective order as to everyone else in the world except for the victim, which the defendant didn't contest. Would you agree there's a big difference between a district court forbidding contact during the trial versus after the trial? Your Honor, and that's a point I made here, there's this huge gap. If you think about it, prior to trial, pretrial services, pending sentencing and supervised release, the court has authority to restrict access during those time periods. If the defendant is sentenced to life in prison, then the court has no authority to protect the victim. And that seems to me to be a wide gap and something that a court can consider in this circumstance. Unless it's a RICO case, right? Unless it's a RICO. Unless it's specifically— If the mafia is in the prison and sneaking out notes to the hitman, right, then the court can order that as part of the sentence. It can order that. The problem here is that this isn't a RICO case. It's distasteful as these facts are. Well, distasteful, and I was going to—Your Honor didn't quote parts of the PSR. There are parts of the PSR. There may be children present. Well, unfortunately, there are adults present, too, Your Honor. Page 178 of the record, and I'm not going to get into it, but he discusses what he wants to do. Let's just stipulate that this case cries out for something. The question is, is that for the district court to decide or for Congress to decide on the first instance? Because you acknowledge that Congress hasn't provided this authority, right? Congress hasn't provided authority, and I'll be frank. The worst argument I have is that Congress cites it in that, in the old Latin phrase expressionis exclusio eternis. In other words, we could draw a negative implication from the statute. You can. I hope you don't, but you can. And we keep forgetting that it's not as if the Bureau of Prisons is just letting prisoners go willy-nilly on the Internet and wander around attacking victims and whatever. I mean, the point of the Bureau of Prisons, in part, is that they're supposed to run the prisons, and they're supposed to have restrictions and actually do. And we get pro se litigants all the time who are complaining about how they don't have access to this and they don't have access to that. And their magazine subscription was cut off and so on and so forth. And the argument always is we're doing that for safety, we're doing that for security. So it seems that if the prison was allowing this man to reach out by the Internet and harass this victim, then she could seek the protective order. But in the meantime, if the prison already has their own restrictions, it's not for the judicial branch to get in the middle of that. That's the kind of day-to-day thing that they deal with. And yet I think there is a role for, and Mistretta, ex parte U.S., Mistretta mostly, realizes that there is, that all three branches have powers that relate to sentencing. And I think the Court certainly has an interest in protecting victims and protecting witnesses, as expressed in these other cases. And I think there is inherent authority. The question is, does it extend? I think if you look at the facts, the PSR, even the mother, part of the victim, she, the mother says she acknowledges her daughter is too young to effectively decide to enter into an intimate relationship, and the defendant and her daughter got into a big rush. However, she will support her daughter's decision to be with the defendant when she gets older. That's not really, it's not U.S., it's not victim versus Thomas Darwish, it's United States versus Thomas Darwish, and the Court has a role. Can you explain something to me from the sentencing, the transcript of the sentencing hearing? There was discussion about Mr. Darwish using the victim as sort of a front to hide from business associates the fact that he was incarcerated? Yes. That's what 102 and 103 of the record, and the quotes I have, we talk on the phone almost every day with her parents' consent. She helps me take care of my business, and then says, no one knows I'm in here, but she, the victim, is able to keep my relationship with them because I write her what to tell them. So he's using the same tools that he's used to entice her to perhaps groom her into this relationship, have her send the images. He's using that same tool while he's in prison awaiting sentencing, and so I think the Court does have a power and does have a responsibility to protect, and I think it is one of those rare and unusual circumstances where the Court actually went through a fairly detailed explanation of her reasoning. This is a rare and unusual case. The defendant was afforded due process by the Court in her explanation of why this was being imposed and why she decided to say when she's matured, as the mother said in the PSR, when she's had a chance to think about this, get to be 25, perhaps then she can pursue this. But at this point, a 15-year-old girl is awfully susceptible to first love, first sex, all of these circumstances that the Court can take into consideration. But did the Court know that that's what was being done here, dealing with a very limited, rare and compelling blah, blah, blah, even if I'm spotting the notion of inherent authority here, which I'm still struggling with, to be honest with you, but even if I'm spotting that, I'm never going to accept that it's some broad, just do what you want, whatever sounds good. I'm going to say it's extremely narrow. And I'm not sure the district court perceived that that's what was being assessed here. I think you're probably correct. I don't think it was presented to the district court in that manner. But I think the Court made findings that suffice and actually get to those points that Wheeler, that Morris, that other cases take into consideration. It is one of these.  on this basis. I mean, I read the transcript. I know what the district court said when he received your concession that, well, the plea agreement is not exactly the way, it doesn't reflect reality, I guess. Then the district court said, well, then I have some discretion about how to structure this no-contact provision. And he said, so I'm giving him a break on supervised release, if I'm not mistaken, but I'm going to keep it in place while he's incarcerated. So the district court was under the impression, given to him by the parties, I think, that he had this discretion. That doesn't make it legal, but that's what was happening. Well, I think there is inherent authority. I think it does extend to no-contact orders, even with the reasoning with Chambers and NASCO, Mistretta, and then the Ninth Circuit and Seventh Circuit case, I think, and limiting to a rare and unusual circumstance. But I think you're right. I don't think the Court was presented it in this manner. But she didn't make those kinds of findings, I mean, that you would make if you thought you were exercising some extremely narrow. That's correct. Okay. But I think there's also the idea that the defendant can affirm, maybe not in this circumstance, but can affirm on any grounds that it finds reasonable. That's the issue of the law in search warrant cases. But normally there can be certain exceptions, but normally when somebody makes an error of law or isn't applying a correct law, we normally let the district court do that in the first instance. And here, I just am very concerned about this traipsing into the field of the Bureau of Prisons. I'm not, again, I'm even assuming arguendo there is that power. It's a power that needs to be exercised extremely limited because the Bureau of Prisons needs to be able to have the discretion to run the prisons. Now, we get involved when prisoners don't get proper medical care, so on and so forth. I'm not saying the courts have no role in that at all. I'm just saying that they're the experts, and they're the executive branch, and they run the prison. That's something we have to realize. So that leads me to this question. What, if there had not been this provision, what would the Bureau of Prisons do with this guy if he was, in fact, calling the victim and she didn't want to hear from him? What would they do? I assume that they would have, there would have been a complaint from the victim or from our office, and there would have been some provision put in place to restrict that access. Right. They have the control on the phone. They have the control on whatever internet access might be provided, and they have control over visitation. Obviously, so does she. She doesn't have to show up at the prison to visit him. He's in a prison. He can't go out and do things on his own. So if there's a problem, is there any indication that the Bureau of Prisons is not doing what they need to do to protect the victim in this circumstance? Your Honor, I agree that they have a role, but I think that that does not take the court's role of protecting victims away from them. I don't think the court has to say this only has to be a recommendation. That's what many cases have done. Let's take a simpler hypothetical. According to Wheeler, the court can impose this kind of order in order to encourage not only that witness, but other potential witnesses from coming forward. So I think the message is, come participate in the justice system, and we'll make sure nobody bothers you after trial. What about acquittal? What about acquittal? Acquittal? Let's say the defendant's acquitted. It sounds to me like, under this theory, the court can still say, defendant, do not bother this witness, because we want to send a message to future witnesses in future cases. We'll make sure nobody bothers you afterwards. Honestly, I don't know about acquittal. I think the court— You see where I'm getting at. —protect the jurors. The same protection that would be in place for a jury that's acquitted is the same as it would be for a juror that— I have similar questions about the jury power. I think the court probably could impose it as a no-contact order. It would have to be enforced by contempt proceedings. And I think that's the way that this order would have to be— The contempt part is separate, right? I mean, once you assume the validity of the court's order, then, of course, you get to enforce it through contempt. The question is, is the order valid on its own? And to my mind, if you look at cases like Chambers, it seems to me that there's a big difference between administering the trial, protecting the prerogatives of the court during trial, and after trial, which gets more into the Federal Government regulating private conduct. If Congress hasn't supported this, I'm not sure where courts get the power to do it. I think the same principles would be in place to protect victims after—or victims or witnesses after an acquittal as well. I think the same principles would have to apply. Right. So—I'm sorry. So under Wheeler, what you're saying is the court would continue to have this no-contact power even after trial, even in the case of acquittal? I think so. Right. I think it would have to. I think principle—that's the principal position, whether it's right or not. May I ask you this, Mr. Roberts? I heard the counsel for defendant concede that he bargained for a—and maybe I misheard this—that he bargained for a minimum sentence of 10 years, could have got much more, and part of the bargain was the no-contact provision. Is that your understanding? Your Honor, that was part of the original plea agreement. I can't stand here and say that I can enforce that because of what I said. Yeah. That's a separate issue, but it was part of— But that is part of the bargain. There was a dismissal of a 15-year count, minimum mandatory 15, for creation of the plea agreement, which we bargained away, capped him at 10 years. So there was a bargain. There was—he received something of value for signing onto the plea agreement, pleading guilty, maintaining that guilty plea. And you had him pretty cold on that. Pardon me? You had him pretty cold on that. Well, you can't ever direct a guilty verdict, I guess, no. Yes, I mean, yeah, we had pretty compelling evidence. So the point is he got a pretty good deal, and your argument is he's kind of trying to Well, I'm not seeking necessarily enforcement of the plea agreement because of the words I used at the change of plea and the sentencing. If we vacate the sentencing condition and send it back, what happens to the underlying deal? I guess, well, what happens to the underlying sentence? Is now anything on the table? I think that the government would probably maintain the original plea agreement in the cap of the 10 years. Why? Because I think it was made considering the facts of the case, the defendant, the victim's family, and the victim. I think we reached what I believe is a fair plea agreement, the 10 years is appropriate for him. Being a 25-year-old with a prior conviction, like you said, and putting him in jail for 10 years, I think is—hopefully would protect the victim from it. So would we have to vacate the entire sentence in order to address this issue of if we concluded that there is some very narrow vein of authority but it has to be exercised knowing that that's what you're doing as the judge and not just sort of accidentally doing it, would we only remand that condition or do we have to vacate the whole sentence and remand the whole thing? I don't think you have to vacate the entire sentence. I think you could do a couple of things. One would be affirm, obviously, which is my hope. Second would be send it back for the court to make findings about NASCA versus Chambers, these cases, whether or not this is a rare and unusual circumstance where this inherent power comes into play. The worst option, I guess, would be that—not worst option— To modify it to make it a— To make it a recommendation to the Bureau of Prisons. I think those are the three options that I— I don't mean to belabor this. Just what was the basis of the district court giving him 120 months? The plea agreement cap, the 11C1C plea agreement cap. The minimum mandatory 10 years capped at 10 years. Okay. So if you can't have a no-contact mandate, obviously you could have a no-contact recommendation. What's the sentence that the government would want if that's the most it can? I hope that the court affirms the district court's rulings. I'm just asking, if in the world you're—we're in is all you can do is a no-contact recommendation to the BOP, do you want a different sentence? No. We're not seeking—we're not seeking any different term of incarceration. No. So you'd be comfortable with the same sentence? Well, if you do that, I hope you don't. Understand. I'm just—I'm asking a hypothetical. Thank you, Your Honors. Did you want to answer? I'm sorry. I thought I answered that. I think you did. I think what you—well, I don't want to put words in your mouth. I think what you're saying is you would not be seeking a different sentence— That's correct. —regardless of what happens to the no-contact. That's correct. Thank you. Thank you. Sorry, I didn't interrupt you. No, you're good. Okay. Mr. Asai, you reserve five minutes for a vote. Thank you, Your Honors. There's one point that I would like to kind of note to the Court. One of the reasons for this no-contact special condition—and it came through at the sentencing hearing, and I apologize, I don't have any record citations. One of the main concerns of the District Court was the victim's age at the time of the sentencing. And I believe at the time of the sentencing, she was approximately 15 years old, maybe 16 years old. But currently, she is—I've spoken with Mr. Darwish on the phone, and he represents that she is 18 years old now. So she's outside the minor status. If this Court— When you first contacted her, she was 14? Yes, Your Honor. How old was she when they were sending the pictures? Probably a few months after the initial contact. So she was still a minor at the time. Fourteen. Yes, Your Honor. But if this Court would consider sending it back to the District Court, the District Court could take that into account, that the minor victim is no longer a minor victim, and that was her main concern. She does note that— However, the judge knew that he was going away for 10 years, and she knew the age of the victim, roughly, and in 10 years, somebody who was 14, even assuming the youngest, is going to be 24. So somewhere along the path of those 10 years, she knew that the victim would turn 18, and yet that didn't seem—that altered the supervised release condition, or lack thereof, but it didn't seem to alter the prison scenario. And that was the reasoning behind eliminating the supervised release portion of the no-contact. Right, but the judge knew that while he was in prison for 10 years, she was going to turn 18 early in that time period, and even turn 21 during that time period, and neither of those ages that we typically use to deem maturity in a young person seem to have much impact on the judge vis-a-vis the incarceration. Okay, so that doesn't seem to be a factor we could look at. Of course, if we're asking for an—if we set our own two-prong test or adopt somebody else's, the judge still would, I know, look at all of the facts. But what age she is now, to me, in the question is just, you know, kind of all of the facts, because she's been forever changed by his conduct. That's correct. And victimized, perhaps, in a way she doesn't even realize fully, but may yet. Okay, what else can we hear from you? The one last thing that I would like to respond to Mr. Roberts' argument, he mentioned the Sotelo case that I'd mentioned in the Rule 28J. He noted that the—it dealt with—the issue there, believed to have dealt with a much broader no-contact special condition. And that is true. He did not challenge the specific no-contact special condition as to one of the victims that he had been harassing. We just wanted to note that that court did look at the issue from, does the district court have inherent authority in general? It wasn't necessarily as to the specificity of the victim or the general broad no-contact. It was just, does the district court have this inherent authority? They noted that the federal statutes that we've already discussed, 3582, only note two very specific types of cases. And those are what? RICO cases and what else? Drug trafficking. Drug trafficking. Let me ask—oh, I'm sorry. Not terrorism? No, Your Honor. We have a terrorist in jail, and it comes to the attention of the district court during terrorist is going to send out an order to blow up a bridge. The district court doesn't have the authority to say, to issue an order that forbids that communication? We would submit that the court could look at the Wheeler two-prong test to, if they so believe, to install this no-contact communication restriction. Okay. So what does the Bureau of Prisons typically do with these recommendations? Do they typically follow them? Your Honor, I don't know specifically. I do not work with the Bureau of Prisons. But from our experience, we do know that when the Bureau of Prisons gets these recommendations, they do take a hard-line look at them. And if there is, it depends on the type of recommendation. It just seems to me unlikely that if the court phrased it as a recommendation, we're not talking about Seagoville versus, you know, some other place, but we're talking about don't let him have contact with a victim, that they're not going to go, oh, no, we want him to have contact here. Have a cell phone and start texting this person. I mean, it just seems like that's the sort of recommendation that would be readily followed and therefore avoids a lot of this very complex, in my view, separation of powers challenge. In Sotelo, the court did note that there is a regulation 28 CFR 540.15A5, which is a general communication restriction. And it's a policy that was promulgated by the BOP. It talks about, Your Honor, my time is up. Would you like to finish your point? I've reviewed the policy, and it's just very general. It kind of looks at different, the type of the offense that the inmate had committed, maybe his criminal history, and the people that he was contacting. Okay. All right. Thank you for your time and consideration. We appreciate both of your arguments and